INDIANA INSURANCE COMPANY,
Appellant–Plaintiff,

v.

AMERICAN COMMUNITY SERVICES, INC., and Donald Scott,
Appellees–Defendants.

Ashley Smith, Janet Smith, Individually and as next friend of Shanelle Tinka Warren Smith and Candice Symone Warren Smith and Crystal Warren Smith Appellees/Intervenors,

v.

Indiana Insurance Company, Defendant in Intervention.

No. 46A05–0107–CV–320.

Court of Appeals of Indiana.

May 29, 2002.

**930**

Michael D. Sears, Jason M. Massaro, Singleton, Crist, Austgen & Sears, Munster, IN, Attorneys for Appellant.

John H. Lovell, Lovell, Lovell & Nedwsom Amarillo, TX, Gene Jones, Mark A. Liednhoop, Newby Lewis Kaminski & Jones, Laporte, IN, Attorneys for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Plaintiff Indiana Insurance Company ("Indiana Insurance") brings an interlocutory appeal challenging the trial court's declaratory judgment that insurance coverage existed for Appellee–Defendant American Community Services ("ACS"). We affirm.

### Issues

Indiana Insurance raises two issues on appeal, which we consolidate and restate as follows:

Whether the trial court's judgment was supported by sufficient evidence.

### Facts and Procedural History

ACS is in the business of processing magazine subscriptions. To this end, ACS contracts with forty to fifty different sales crews across the United States. These sales crews conduct door-to-door magazine sales. Crew managers provide the vans that transport the sales crews from city to city and to the neighborhoods within the cities. ACS has independent contractor contracts with these crew managers. The crew managers, in turn, maintain independent contractor contracts with their salespeople.

On October 11, 1992, a van owned by crew managers Jane and Andre Walker ("Walkers") and carrying a sales crew that was soliciting magazine sales to be processed at ACS, was involved in a one-vehicle accident just west of Amarillo, Texas. As a result of this accident, passenger Charles Harrington ("Harrington") was severely injured and passenger Basil Smith ("Smith") was killed.

In the facts and procedure section of the parties' previous interlocutory appeal, we summarized in part as follows:

At the time of the accident, ACS had obtained two insurance policies from Indiana Insurance: a standard "IndiPack Liability Coverage Policy of Insurance" (the "IndiPack Policy") [a general liability insurance policy] and a "Comprehensive Excess Liability Policy" (the "Excess Policy") [a drop down excess umbrella policy]. The IndiPack policy had been amended with an endorsement that read in pertinent part:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

HIRED AUTO AND NON–OWNED AUTO LIABILITY

This endorsement modifies insurance provided under the following:

INDIPACK POLICY

A. Insurance is provided only for those coverages which are shown in the Declarations.

1. HIRED AUTO LIABILITY

The insurance provided under the Indi-Pack Liability Coverage Form, paragraph A.1. Business Liability, applies to "bodily injury" or "property damage" arising out of the maintenance or use of a "hired auto" by you or your employee in the course of your business.

2. NON–OWNED AUTO LIABILITY

The insurance provided under the Indi-Pack Liability Coverage Form, Paragraph A.1. Business Liability, applies to "bodily injury" or "property damage" arising out of the use of any "non-owned auto" in your business by any person other than you....

C. The following additional definitions apply:

2. "Hired auto" means any "auto" you lease, hire or borrow. This does not include any "auto" you lease, hire or borrow from any of your employees or members of their households, or from any partner or executive officer of yours.

3. "Non-owned auto" means any "auto" you do not own, lease, hire or borrow which is used in connection with your business. However, if you are a partnership, a "non-owned auto" does not include any "auto" owned by any partner. [Footnote omitted]

*Indiana Ins. Co. v. American Community Services, Inc.*, 718 N.E.2d 1147, 1149–50 (Ind.Ct.App.1999).

On December 16, 1992, Harrington filed a lawsuit for his injuries in the United States District Court for the Northern District of Texas, Amarillo Division, naming ACS as one of the Defendants. On August 9, 1994, a wrongful death action was filed by the beneficiaries of Smith in the same court. Again, the pertinent procedural histories of these cases were summarized by this Court in the previous interlocutory appeal.

### Procedural History—Harrington

On December 16, 1992, Harrington sued ACS, the Walkers, Paragon, and Isaac [1] in federal court in Texas ... [footnote omitted]. Initially, Indiana Insurance defended ACS in the Harrington suit; however, Indiana Insurance sent a letter dated January 4, 1994, [footnote omitted] to ACS president Scott, expressing a reservation of rights. The letter also "direct[ed]" Mr. Scott's "attention to exclusion (e) of the policy which excludes bodily injury to an employee of the insured ... [and to] exclusion (j) of the policy which provides that there is no insurance coverage for bodily injury or property damage arising out of the ownership, maintenance, use or entrustment of any auto owned by the insured."

The Harrington suit was tried to a jury in the Texas court. On February 16, 1994, a final judgment of $300,000 was entered in favor of Harrington against Isaac, ACS, and the Walkers ("the Harrington judgment").[2]

In response to the Harrington judgment, Indiana Insurance filed a complaint for declaratory relief against ACS

---

1. Isaac was the driver of the wrecked vehicle.

2. The Harrington judgment included conclusions that an employee-employer relationship existed, both between Isaac and the Walkers. The trial court applied Texas substantive law

to reach these conclusions. ACS appealed the Harrington judgment to the Fifth Circuit Court of Appeals, which affirmed it on September 8, 1995. ACS paid the Harrington judgment, which with interest and costs totaled $344,701.63, in October 1995.

... in the LaPorte Superior Court on March 14, 1994 ... seeking a determination that neither of its policies issued to ACS afforded ACS any right of indemnification for the Harrington judgment. ACS's answer stated that Indiana Insurance had agreed to represent ACS under the terms of the policy issued and had therefore waived any right to deny coverage and should be estopped from so doing. Among other affirmative defenses, ACS asserted that Harrington was not an employee of ACS. Finally, ACS counter-claimed that by reserving its rights within days of the trial in the Harrington suit, Indiana Insurance had breached the agreement between the parties, which was an act of bad faith.

Indiana Insurance moved for summary judgment in the Harrington declaratory action on April 30, 1998, asserting that there was "no genuine issue that the van driven by Isaac was neither a 'hired auto' nor a 'non-owned auto' as defined under the [hired auto and non-owned auto liability endorsements]," and as such, there was "no genuine issue that there is no coverage under the Indi-Pack Policy" or under the Excess Policy, and that Indiana Insurance was entitled to declaratory judgment as a matter of law. In support of this summary judgment motion, Indiana Insurance submitted among its designated evidence its request for admissions and ACS's answers thereto. [Footnote omitted]

In response to Indiana Insurance's summary judgment motion, on June 11, 1998, ACS moved to withdraw its admissions in the Harrington declaratory action. On June 15, 1998, ACS filed its own motion for partial summary judg-ment on its policy coverage and breach of contract claims, a brief in response to Indiana Insurance's summary judgment motion, and a motion for abatement regarding the issue of coverage under the Excess Policy.[3]

ACS asserted more than ten different grounds for summary judgment in its favor. The two arguments pertinent [in this previous interlocutory appeal were] (1) that as a matter of law, the van "was either a borrowed 'hired auto' or a 'non-owned auto'" and (2) that as a matter of law, Harrington and Smith could not have been in the course of their employment when the accident occurred because they were sleeping at the time.

The trial court denied all parties' summary judgment motions on August 17, 1998.[4]

### *Procedural History—Smith*

On August 8, 1995, the Smiths filed their complaint against ACS, Isaac, and the Walkers in the same Texas court in which the Harrington suit had been tried. The Texas court entered summary judgment in favor of the Smiths on September 14, 1995, ruling that Isaac's negligence on the date of the accident proximately caused Smith's death; that Isaac was acting within the course and scope of his employment at the time of the accident; that an employer-employee relationship existed between Isaac and the Walkers; and that Isaac and the Walkers were jointly and severally liable for the damages and injuries to Smith. On October 27, 1995, the Texas court entered a second summary judgment order, reiterating its previous conclusions

3. On the same date, ACS and the Smiths filed identical motions in the Smith declaratory action.

4. ....

In its order of August 17, 1998, the trial court also denied ACS's motion to withdraw admissions, but granted ACS's motion for abatement regarding coverage under the excess policy.

and entering the following new conclusions: that an employer-employee relationship existed between Isaac and ACS at the time of the accident, and that ACS was liable jointly and severally with the Walkers for the damages and injuries to Smith.

As it had in the Harrington suit, on October 20, 1995, Indiana Insurance filed a complaint for declaratory relief against ACS in the Smith matter.... In response, the Smiths filed an original complaint in intervention on February 5, 1996.[5]

*Indiana Ins. Co.*, 718 N.E.2d at 1150–52. Each party subsequently moved for summary judgment, which was denied by the trial court. On appeal, we affirmed the trial court's rulings, holding in part as follows:

It will be for the finder of fact to determine whether the IndiPack policy and its endorsements are ambiguous in light of the situation presented by the arrangement between ACS and the Walkers, and in light of the employment of Smith and Harrington as determined by the finder of fact.

*Indiana Ins. Co.*, 718 N.E.2d at 1155.

Thereafter, on February 13th and 14th of 2001, the trial court conducted a bench trial regarding the breach of contract portion of the case. The trial court entered findings of fact and conclusions of law in which it found and held in part as follows:

**D.** *The Insuring Agreement—Coverage Clauses.*

....

16. The employee/independent contractor status of Basil Smith was not an ultimate issue of fact in either *Harrington v. ACS* or in *Smith v. ACS* and was never determined in either lawsuit.

**5.** The Smiths were granted leave to and did file a first amended complaint in intervention

**E.** *Exclusion Clauses of Endorsements.*

### Facts Re: the Non–Owned Auto Liability Endorsement

17. The van in question was titled to and owned by Andre Walker....

18. The van was insured by Walkers'/Paragon's insurance company, Unicorn Insurance Company....

19. Andre Walker was never an employee, partner, officer, or director of ACS.

20. On the date, time, and occasion in question, Andre Walker's van was being used in connection with ACS's business. This van was furnished by the Walkers/Paragon as part of their business arrangement with ACS....

21. The van was a "non-owned auto" as defined by the IndiPack policy. Moreover, at the time of the accident, the van was not "leased, hired or borrowed, by ACS.["] ...

22. Moving Andre Walker's van from Oklahoma City, Oklahoma to Phoenix, Arizona was being done in connection with the business of ACS.

23. The van rollover was an "occurrence" which arose out of the use of a "non-owned" automobile.

### Facts Re: the Employee Exclusion

24. Basil Smith was not in the course of any employment with ACS when the van was rolled and was not acting with any intent to serve ACS.

### Facts Specific to Basil Smith's Independent Contractor Status

25. At all relevant times, ACS and the Walkers/Paragon had an independent contractor relationship.

on June 26, 1998.

26. Indiana Insurance Co. failed to sustain its burden of proof that Smith was an employee of ACS.

27. At the time of the occurrence, Basil Smith was not an employee of ACS.

**F.  *Choice of Law***

28. In regard to contract issues, the parties made no choice of law agreements.

29. Andre Walker was the crew chief and president of Paragon, Incorporated.

30. Paragon, Incorporated, was incorporated under the laws of the State of Illinois and Andre Walker and Jane Walker were residents of the State of Illinois.

31. Andre Walker, as crew chief, picked all of the sale sites throughout the country for his crew.

32. The vehicles used to transfer crew members were registered to Andre Walker in the State of Illinois.

33. Andre Walker recruited people to become members of his crew for purposes of sale of magazine subscriptions.

34. The initial contact for hiring for Basil Smith and Charles Harrington was with Andre Walker/Paragon, Inc.

35. The van rollover which killed Basil Smith occurred in Texas.

36. Both suits, *Harrington v. ACS* and *Smith v. ACS*, were filed, investigated, discovered, and tried in Texas. Both suits against ACS were tried and submitted on Texas law, and both judgments were entered in Texas.

37. The Walkers and Paragon resided in the State of Illinois and maintained their office and business records in Illinois.

38. The relationship of Basil Smith with the Walkers and Paragon was centered in Illinois.

39. The insured, ACS, and the insurance company, Indiana Ins. Co., are residents and citizens of the State of Indiana.

40. There were no actual "negotiations" over the terms or issuance of the two policies of insurance. ACS requested the agent, Harley Snyder, to acquire appropriate insurance coverage to insure the known risks of ACS's business, specifically including and contemplating the risk of being sued in various states for personal injuries caused by wrecks involving the vans carrying magazine salesmen.

41. Both insurance policies were issued in the State of Indiana.

42. Both insurance policies insured various risks to the insured in all fifty (50) states. In issuing the two insurance policies, Indiana Ins. Co. intended to insure ACS for covered risks which might accrue in any state, including Texas.

43. Neither insurance policy contained any choice of law provision.

. . . .

### CONCLUSIONS OF LAW

. . . .

**D.  *Coverage Clauses.***

5. The October 11, 1992, accident in which Basil Smith was killed fell within the coverage clauses of both policies and the applicable endorsements.

6. The *Smith v. ACS* claim was asserted (1) against the insured (ACS), (2) for "bodily injury" or "personal injury" (which included death), (3) caused by an "occurrence", (4) within the policy period of both policies, and (5) with the coverage territory for both policies.

7. The van rollover was an "occurrence".

8. All claims covered under the Indi-Pack policy are also covered

9. The *Smith v. ACS* claim and judgment arose out of an occurrence that fell

within the coverage clauses of both policies and both endorsements.

10. Under Illinois [6] law, Basil Smith was an independent contractor and not within the course of any employment at the time of the October 11, 1992 accident.

. . . .

### E. *Exclusion Clauses of Endorsements*

11. Pursuant to the terms of the Excess/Umbrella policy, if any claim is covered under the IndiPack policy (the "underlying insurance" referenced in the Excess/Umbrella policy), it is also covered by the Excess/Umbrella policy.

12. In regard to both policies, the *Smith v. ACS* claim fell within the coverage clauses of the endorsements.

13. No exclusion clauses in the endorsements of either policy excluded coverage for the *Smith v. ACS* claim.

### F. *Choice of Law*

14. In regard to contractual construction questions, Indiana has the most intimate contacts with the facts of this case.

15. Contract construction and interpretation questions should be decided under Indiana law.

16. The determinations of whether Basil Smith was an employee of ACS and whether he was within the scope of employment when he was killed should be determined under the laws of the State of Illinois.

17. Texas bears significant connection to this legal action and the claims made herein.

. . . .

(Appellant's Brief vii-xiv.)

Indiana Insurance brings an interlocutory appeal challenging the trial court's judgment.

## Discussion and Decision

### *Sufficiency of the Evidence*

Indiana Insurance contends that the trial court erred when it applied Illinois law to determine whether Smith was an employee of ACS. Further, Indiana Insurance argues that had the trial court properly applied Indiana law to determine Smith's employment status it would have determined that Smith was an employee, and as such that Indiana Insurance did not breach its contract by denying coverage and indemnification to ACS. More specifically, Indiana Insurance takes issue with the trial court's two-tiered analysis, in which the trial court begins by deciding which state's laws were applicable to the contracting parties and then determines which state's laws applied to the term "employee." Indiana Insurance maintains that the sole question at issue is whether Smith "was an 'employee' acting within the course of employment at the time of his death." (Appellant's Brief at 11.) While we agree with Indiana Insurance's suggested analytical framework, we nevertheless find the evidence sufficient to support the trial court's judgment regardless of whether Illinois or Indiana law is applied.

### *Standard of Review*

■ When the trial court has entered findings of fact and conclusions of law upon the request of a party, pursuant to Indiana Trial Rule 52, we apply the following two-tier standard of review: whether the evidence supports the findings and whether the findings support the judgment. *CSX Transp., Inc. v. Rabold*, 691 N.E.2d 1275, 1277 (Ind.Ct.App.1998). The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, that the record contains no facts or inferences supporting them. *Id.* A

6. Under Indiana law, Basil Smith would also be found to be an independent contractor and not within the course of any employment at the time of the October 11, 1992 accident.

judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Ahuja v. Lynco Ltd. Medical Research,* 675 N.E.2d 704, 707 (Ind.Ct. App.1996).

### Rules of Law—Independent Contractor versus Employee

■ The contractual question presented to this Court is whether Smith was an employee of ACS at the time of the accident. If Smith was an employee, then Indiana Insurance did not breach its contract by denying coverage and indemnification to ACS. However, if Smith* was an independent contractor, then Indiana Insurance breached its contract. Recently, in *Stewart v. Jones,* 318 Ill.App.3d 552, 252 Ill.Dec. 358, 742 N.E.2d 896 (2001), the Illinois Court of Appeals had the opportunity to summarize and reassert the requisite factors for distinguishing between an independent contractor and an employee under Illinois law. The Illinois Court of Appeals held as follows:

> An independent contractor undertakes to produce a certain result but is not controlled as to the method in which he obtains that result. On the other hand, a principal-agent relationship exists when the principal has the right to control the manner in which the agent performs his work and the agent has the ability to subject the principal to personal liability. There are no rigid rules for determining whether a person is an employee or agent or an independent contractor, but courts should consider the following factors: the right to control the manner in which the work is performed; the right to discharge; the method of payment; whether taxes are deducted from the payment; the level of skill required to perform the work; and

the furnishing of the necessary tools, materials, or equipment. The right to control the way the work is performed is the dominant factor.

*Id.* at 903. (Internal quotes and cites omitted).

Several of the foregoing factors are included in Indiana's test for distinguishing between an independent contractor and an employee. *See Moberly v. Day,* 757 N.E.2d 1007, 1009–10 (Ind.2001). In *Moberly,* our supreme court adopted the following factors from the RESTATEMENT (SECOND) OF AGENCY § 220 (1958) to distinguish employees from independent contractors:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;
>
> (h) whether or not the work is a part of the regular business of the employer;
>
> (i) whether or not the parties believe they are creating the relation of master and servant; and
>
> (j) whether the principal is or is not in business.

No single factor is dispositive. *Moberly,* 757 N.E.2d at 1010.

A. *Analysis—Under Indiana Law*

*Extent of Control*

"Restatement (Second) of Agency § 220(1) (1958) defines a servant (i.e. employee) as one 'employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.'" *Moberly,* 757 N.E.2d at 1010.

ACS did not control the day-to-day activity of those soliciting magazine sales.

Q: Okay. Now, does American Community Services instruct you [Andre Walker; Smith's crew manager] where you're to go to try to solicit magazine subscriptions, you know, what town or state?

A: No.

Q: Who makes those decisions?

A: I do.

Q: Does American Community Services make any decisions about, you know, how long you stay in a given town or what neighborhoods to go sell in?

A: No.

Q: On a day-to-day basis, what contact would the solicitors have with the ACS office here in Michigan City?

A: None.

(Tr. at 185.) Control or the right to control is an important factor. *See Moberly,* 757 N.E.2d at 1010 (citing RESTATEMENT (SECOND) OF AGENCY § 220(1) comment d). Here, the Record indicates that ACS had minimal, if any, control over the particulars of soliciting magazine sales. As such, the important control factor favors a conclusion that Smith and ACS did not have an employer-employee relationship.

*Occupation or Business of One Employed*

Smith worked for the Walkers first as a door-to-door salesman and then later as a car handler (or one who assigns sales territories and supervises salespeople). In these roles, Smith's employment was not entirely disjointed from the business of ACS. This factor weighs in favor of finding an employer-employee relationship.

*Amount of Direction Received by Employer*

As was clear from our analysis of the control factor, ACS did not supervise the day-to-day work of sales crews. Accordingly, this factor supports Smith's status as an independent contractor.

*Skill Required for Particular Occupation*

Neither the briefs nor the Record speak to special or particularized skills required for the sale of magazine subscriptions to be processed by ACS. However, the general nature of the work, namely, door-to-door sales, does not require specialized skills. This factor weighs toward an employee-employer finding.

*Supply of Instrumentalities*

ACS provides salespeople with magazine listings, price cards and receipts. Crew managers, such as the Walkers, supply a means of transportation. On balance, the provision of these necessities favors a finding that Smith was an employee of ACS.

*Length of Employment*

It would appear from the Record that Smith began soliciting magazine subscriptions (to be processed at ACS) as early as 1982. Smith's long employment, both as a door-to-door salesman and car handler, is indicative of an employee-employer relationship. *See Moberly,* 757 N.E.2d at 1012 (quoting RESTATEMENT (SECOND) OF AGENCY § 220(2) comment h) (stating that "employment over a considerable period of time with regular hours" and "one who performs continuous service for another" are indicators of servant, or employee status.)

*Method of Payment*

Comment j to the RESTATEMENT (SECOND) OF AGENCY § 220(2) further provides:

If the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him. This is especially true if payment is to be made by the job and not by the hour. If, however, the work is not skilled, or if the employer supplies the instrumentalities, the workman may be found to be a servant.

The Walkers testified that they paid Smith weekly, based upon his sales. Indiana Insurance also generally identified ACS's system of cash bonuses or prizes based upon sales, but failed to identify evidence that Smith had received these bonuses or cash prizes from ACS. Thus, Smith's employment was based upon the job and as was previously determined not under the control of ACS. However, Smith's employment was also long term, did not require special skill, and utilized some instrumentalities supplied by ACS. On balance, these facts favor an employee-employer determination.

### Regular Business of the Employer

ACS is a clearinghouse for magazine subscriptions. Smith was in the business of soliciting magazine subscriptions to be processed at ACS. This factor weighs in favor of employee-employer status.

### Belief of the Parties

The trial court found that the intent of ACS in acquiring the IndiPack Policy and the Excess Policy was to secure insurance that indemnified ACS from the very liability that was found in the Texas judgments involving Smith and Harrington. This finding was supported by the testimony of ACS's general manager.

Q: Has American Community Services been sued before involving ... van wrecks?

A: Yes.

Q: Was it a risk that concerned you?

A: Yes.

. . . .

Q: Now, did you communicate this concern about potential liability arising out of these van wrecks to your insurance agent, Harley Snider?

A: Yes.

Q: Did you make a specific request that you acquire insurance that would cover that type of liability?

A: Yes. We had long conversations about how to properly protect ourselves and we wanted, among other things, non-owned auto coverage.

(Tr. 364.) The general manager's testimony also supported the inference that the Harley Snyder agency was aware that ACS was in the business of processing magazine orders from throughout the country and used multiple levels of independent contractors.

Q: Was the Harley Snider agent aware of how your business and the business of these crews worked?

A: Yes.

Q: And was that important to you for him to know how your business operated?

A: It was very important.

(Tr. 67.) From the above testimony, and the clear language of the non-owned auto provision, it may be inferred that there was a meeting of the minds between the contracting parties regarding the risks to be insured, which supports the trial court's general legal conclusion that "[t]he *Smith v. ACS* claim and judgment arose out of an occurrence that fell within the coverage ...". (Brief of Appellant at xiii.)

Additionally, the testimony from both ACS's general manager and the Walkers indicated that there were independent contractor contracts between ACS and the Walkers, and between the Walkers and their salespeople. These relationships

were the subject of previous audits by the IRS in which it was determined that the crew leaders were not employees of ACS. The status of these relationships, and how they affected insurance coverage, was information available to Indiana Insurance at the time of contracting. This factor weighs heavily in favor of determining Smith's relationship to ACS to be that of an independent contractor.

### Is the principal in business?

ACS is in the business of processing magazine subscriptions. This process is dependant upon the solicitation of magazine sales. Therefore, this factor favors employer-employee status.

### B. Analysis—Under Illinois Law

Under Illinois law, the only factors left unaccounted for after our *Moberly*-analysis are the right to discharge and whether taxes are deducted from the payment.

### Right to Discharge

It does not appear that ACS had the right to directly discharge Smith, however it's control over what subscriptions crew managers such as the Walkers could sell, and then process at ACS, clearly allowed it to influence which employees crew managers retained.

Q: Now, do you, ACS, have the choice of who you do business with as a crew and who you don't?

A: Oh yes.

Q: And have there been instances where you've worked with a crew leader or owner or manager and didn't like the way he was doing business and just stopped doing business with him?

A: Well, yes....

(Tr. 341.) With such influence, Smith's relationship to ACS was more akin to that of an independent contractor than that of an employee.

### Taxes

Lastly, we would note that ACS did not send W 2 tax forms to either crew managers or their solicitors, but rather only mailed 1099 tax forms when solicitors earned over $600.00 in subscription sales. Again, this factor weighs in favor of determining ACS's relationship to Smith as that of an independent contractor.

Given the weight of such important factors as ACS's limited control and supervision, the intent of the contracting parties, and the existence of multiple layers of independent contracts between ACS, its crew managers, and salespeople, we find that under either Indiana or Illinois law [7] Smith was not an employee of ACS at the time of his death. Accordingly, Indiana Insurance breached its contract by denying coverage and indemnification to ACS.

Affirmed.

SHARPNACK, J., and DARDEN, J., concur.

---

**7.** Inasmuch as our analysis of the factors from either state renders the same result, we need not decide the choice of law issue raised by Indiana Insurance. *Cf. Allen v. Great American Reserve Ins. Co.,* 766 N.E.2d 1157, 1162 (Ind.) (stating in part that "[o]rdinarily a choice of law issue will be resolved only if it appears there is a difference in the laws of the potentially applicable jurisdictions.")